Filed 1/26/23  In re K.F. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.F., a Person Coming Under the Juvenile Court Law. | |
| | D080834 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. EJ04624A) |
| Plaintiff and Respondent, | |
| v. | |
| C.F., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Vincent Uberti, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant C.F. (Father) appeals from the final judgment and order terminating jurisdiction in a Welfare and Institutions Code[1] section 300 dependency proceeding regarding his daughter, K.F. The juvenile court returned K.F. to the custody of her mother M.B. (Mother) and presumed father S.P., and granted Father visitation.[2] On appeal, Father argues that substantial evidence does not support the juvenile court's finding that he received reasonable reunification services. He also argues that the juvenile court abused its discretion in denying him joint legal custody over K.F. Finally, Father argues that the court's in-person visitation order was too vague. We conclude that there is substantial evidence to support the court's reasonable services finding by clear and convincing evidence, and that the custody and visitation orders were not an abuse of discretion under the circumstances. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Background Preceding Prior Appeal from Disposition Order*[3]

Mother was born in the Philippines and began a relationship with Father while living there. Mother moved to San Diego in 2013 when she was seven months pregnant with K.F., and named Father as the father on K.F.'s

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Father and S.P. were both determined to be presumed fathers to K.F. Mother and S.P. are not parties to this appeal.

[3] Father previously appealed the disposition order placing K.F. with maternal relatives rather than with Father. We cite primarily to this court's prior unpublished opinion in *San Diego County Health and Human Services Agency v. C.F.* (Aug. 2, 2022, D079899) [nonpub. opn.] (*In re K.F.*) to provide relevant facts up to and including the disposition order.

2

birth certificate.  A few years later, Mother began a new relationship with S.P., who treated K.F. as his own child.  Mother gave birth to two other daughters, in 2018 and 2021, and named S.P. as the father on their birth certificates.  (*In re K.F.*, *supra*, D079899.)  Mother still lives in San Diego with S.P. and their children.  Father still lives in the Philippines.

In April 2021, the San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (b) petition on behalf of K.F. based on Mother's alleged amphetamine and methamphetamine use.  The court found that the Agency made a prima facie showing on its petition and that S.P. was K.F.'s presumed father.  The court detained K.F. out of the home and gave the Agency discretion to place K.F. with a relative or nonrelative extended family member.  At the time of the detention hearing, K.F. and her two siblings were already residing with, and being cared for by, their maternal great-aunt and great-uncle.  (*In re K.F.*, *supra*, D079899.)

During a telephone interview, Father told the Agency that he was K.F.'s father and that K.F. knew he was her father.  He had been sending Mother $200 per month, but had recently stopped because he did not know where the money went.  Father had a video chat with K.F. three weeks earlier and claimed Mother threatened that if he did not send the money, he could not speak with K.F.  Father stated that he could provide care for K.F. and wanted her placed with him.  At a hearing in May 2021, the court declared Father to be K.F.'s presumed father.  (*In re K.F.*, *supra*, D079899.)

In its July 2021 addendum reports, the Agency reported that Mother and S.P. had completed parenting classes and that Mother visited K.F. daily. The Agency also reported that Mother recently tested positive for amphetamines and methamphetamine.  Father had two supervised virtual visits with K.F., who appeared engaged with Father.  At the jurisdiction

hearing, the court made a true finding on the petition's allegations and set the matter for a contested disposition hearing. (*In re K.F.*, *supra*, D079899.)

In its October 2021 addendum report, the Agency recommended that K.F. be placed with Father. K.F. stated she did not want to move to the Philippines with Father and instead wanted to live with S.P. She could not remember her previous visit with Father in the Philippines, and stated she would miss Mother, S.P., and her half-sisters. Father continued to request that K.F. be placed with him and submitted proof that he could support and care for her. During his weekly video visits with K.F., Father told her he loved and missed her, and she told him she loved and missed him too. When Father asked her about living with him in the Philippines, K.F. stated that she did not want to go. She also said she would miss her half-sisters. (*In re K.F.*, *supra*, D079899.)

At the contested disposition hearing in October 2021, the court authorized conjoint therapy for Father and K.F., then continued the matter until November at the request of K.F.'s counsel. (*In re K.F.*, *supra*, D079899.) While not reflected in our prior opinion, our review of the record shows that K.F.'s counsel requested therapy for K.F. to help her deal with the impact of potentially separating from her half-sisters if she were placed with Father. K.F.'s counsel suggested "perhaps [Father] can even participate." The court noted that it appeared K.F. had been spending more time with Father and questioned whether she needed to spend even more time with him in a therapeutic setting. The court nonetheless authorized conjoint therapy, but did not order it as a reunification service, and instead left it to the Agency as a case management decision.

In its November 2021 addendum reports, the Agency reported that K.F.'s therapist diagnosed her with an adjustment disorder with mixed

disturbance of mood and conduct.  The Agency indicated that Mother would soon graduate from the parent care program and intended to attend aftercare classes.  Father had not received many of his visits with K.F.  (*In re K.F.*, *supra*, D079899.)

The contested disposition hearing occurred on November 4 and December 17, 2021.  The court admitted Mother's stipulated testimony that she had negative drug tests since May, she had graduated from the parent program in October, and she would begin aftercare in November.  The court admitted K.F.'s stipulated testimony that she did not want to live with Father in the Philippines and instead wanted to live in San Diego with Mother and her half-sisters.  K.F. stated she would cry and lock herself in her room if she were unable to continue living with her half-sisters, Mother, or S.P.  In his stipulated testimony, Father said he knew K.F. had a close attachment to her siblings and family, and that he planned to provide her with an iPad to allow her to have video calls with them if she were placed with him.  (*In re K.F.*, *supra*, D079899.)

A forensic psychologist who specializes in conducting bonding studies concluded that K.F. had an "average relatively strong sibling bond" with her half-sisters and believed that if K.F. were separated from them by moving to the Philippines, the separation would have a traumatic effect, which could be detrimental to K.F.'s emotional or psychological well-being.  He testified that if there was a careful transition for K.F., her trauma could be overcome because she has resilience.  (*In re K.F.*, *supra*, D079899.)

The Agency's social worker testified that K.F. could not safely return home with either Mother or S.P. because Mother had only recently attained sobriety.  The social worker recommended that K.F. be placed with Father in the Philippines.  She understood that K.F. did not want to live with Father

but believed that K.F. did not have the maturity to decide where to live and that there were ways to minimize K.F.'s trauma. She also believed that K.F. could adapt to living with Father because she had adapted well to living with maternal great-aunt. K.F. had not had any contact with her family in the Philippines since she was three years old, and the Agency was still waiting for Mother to provide K.F.'s passport so that she could visit Father. (*In re K.F.*, *supra*, D079899.)

The juvenile court found, by clear and convincing evidence, that K.F. should be removed from Mother and S.P. Rejecting the Agency's recommendation and relying on precedents finding emotional detriment when a child is separated from siblings and forced to live out-of-state with a noncustodial, nonoffending parent, the court decided it would be detrimental to K.F. to place her with Father. The court explained that K.F. was "unusually bonded to her sisters." It found that K.F. suffered from an adjustment disorder, making her "more fragile" than other children, and concluded that it would be an "intense disruption" for K.F. to be placed with Father in another country against her wishes. The court also noted it would make little sense to remove K.F. from a placement that was working if she could reunify with Mother and S.P. within a few months. (*In re K.F.*, *supra*, D079899.)

The court ordered that K.F. be removed from the custody of Mother and S.P. and remain in her current placement with maternal great-aunt and great-uncle. It directed that reunification services be provided to Mother and S.P., and that Father be provided with visitation. Father appealed the dispositional order, challenging the court's decision not to place K.F. with him. We concluded that there was substantial evidence to support the court's

6

finding that it would be detrimental for K.F. to be placed with Father, and thus affirmed the dispositional order. (*In re K.F., supra*, D079899.)

B. *Subsequent Developments Following Disposition Order*

It its December 17, 2021 disposition order, the court ordered that K.F. and Father have one in-person visit before the next hearing, which was a combined six-month and 12-month section 366.21 review hearing set for June 15, 2022. On January 21, 2022, the Agency requested a certified minute order of the December 17, 2021 hearing, which Father needed to apply for a travel visa. On January 26, 2022, the Agency requested that K.F. be permitted to renew her passport and travel to the Philippines to visit Father if his travel visa was denied. The court authorized K.F. to travel outside of the United States and authorized the Agency and/or K.F.'s parents to renew K.F.'s passport.

The Agency filed an addendum report on April 27, 2022, to report that the Agency had "encountered significant challenges" in complying with the court's order that K.F. and Father have an in-person visit before the June 15, 2022 hearing. The Agency reported that on January 24, 2022, the Agency asked Mother to renew K.F.'s passport and Mother agreed. In response to the Agency's inquiries on February 9 and 17, 2022, Mother informed the Agency that she could not yet afford the fees to renew K.F.'s passport. The social worker asked her supervisors how the Agency could help Mother pay for the renewal fees, and was informed that the only options were for Mother to pay and be reimbursed by the Agency or for Mother to obtain an invoice from the post office, which the Agency would pay directly. When the social worker asked if she could pay the fees herself and be reimbursed, her supervisors initially said that was not an option. When the social worker asked if she could use "petty cash" and go with Mother to the post office to

7

pay the renewal fees, she was told this was not an option either. On February 18, 2022, the social worker called the post office to request an invoice to be paid by the Agency, but the post office was unable to provide an invoice. The social worker informed Mother that she would need to pay the fees and be reimbursed by the Agency, which Mother agreed to do once she had the money. That same day, Father informed the Agency that the earliest he could obtain a travel visa was November 2023.

On February 24, 2022, the social worker followed up with Mother, who again replied that she did not yet have the money to renew K.F.'s passport. In response to another follow-up on March 16, 2022, Mother informed the social worker that she would have the money to renew K.F.'s passport once Mother received her tax refund. On March 21, 2022, the social worker informed Father of the challenges in renewing K.F.'s passport, and Father offered to send money to pay for it himself. The social worker asked her supervisors if this was an option, but they said the Agency could not accept money from Father via mail.

On March 22, 2022, the social worker informed her supervisor that the only way to renew K.F.'s passport was for the social worker to pay for it out-of-pocket and be reimbursed by the Agency. The supervisor authorized her to do so. On March 30, 2022, after waiting in line for over an hour, Mother and the social worker learned that the renewal request could not be processed without K.F.'s birth certificate. The passport clerk at the post office indicated that there were no appointments available for four to six weeks, and the social worker and Mother agreed to try another walk-in on April 6, 2022. When they returned, the passport clerk indicated that the wait would be over two hours and asked if they could return with an appointment on April 8, 2022, which they agreed to do. When they returned again, the passport clerk

indicated that a standard application would take eight to 11 weeks, or an expedited application would be processed in five to seven weeks for $60 more. The social worker agreed to expedite the application and paid a total of $237.40 out of her own pocket.

In addition to updates regarding K.F.'s passport, the Agency also reported that Father's phone visitation with K.F. had not been occurring. According to Mother, K.F. did not want to speak with Father, and Father had called only once or twice since January 14, 2022. According to Father, he attempted to call every week, but Mother would either not answer the phone or say that K.F. was busy and could not talk. K.F. told the social worker that she did not want to talk to Father or go to the Philippines to visit him. On March 21, 2022, Father sent the social worker screenshots of his phone, showing three attempts to FaceTime K.F., but the dates of the calls were unclear in the photos. The social worker asked Father to show the details of the dates and duration of the calls, but he did not respond or provide additional screenshots.

At a special hearing on April 27, 2022, the Agency informed the court that K.F. was currently placed with Mother and requested that the minute order reflect the same. Due to the passport issues, the Agency indicated that it was unclear whether it would be able to comply with the court's order that K.F. complete an in-person visit with Father before the June 15, 2022 hearing. K.F.'s counsel expressed concern with keeping the case open merely to ensure the visit occurred. Mother's counsel emphasized that Mother had not refused to renew K.F.'s passport and indicated that while $237 may not seem like a lot of money to some, it was a financial impediment to Mother. Father's counsel requested that the Agency continue to make arrangements for K.F. to visit Father in the Philippines in compliance with the court's prior

order. Father's counsel also noted that Mother seemed to not be responding to Father's attempts to maintain virtual contact with K.F., and requested that the Agency assist in setting up a schedule for the virtual visits.

The court acknowledged the efforts by the Agency, Mother, and Father to coordinate an in-person visit between K.F. and Father, particularly the social worker's "extraordinary efforts." The court ordered the Agency to continue to make best efforts to facilitate that visit before the next hearing. The court also noted that K.F. was currently placed with Mother, reminded Mother that the court had ordered virtual visitation between K.F. and Father, and asked the Agency to set up a schedule for the virtual visitation to occur. The court confirmed the next hearing date on June 15, 2022, which the court indicated would be a six-month family maintenance hearing, although the minute order indicates that it was a section 366.21 six-month review hearing.

In its June 15, 2022 status review report, the Agency reported that K.F. was reunified with Mother and S.P. on January 24, 2022, and was doing well in their care. The Agency recommended that K.F. remain placed with Mother and S.P., Father continue to be offered phone visitation, and the court terminate jurisdiction. The Agency also reported that on May 3, 2022, Mother received a notice indicating that K.F.'s passport application was denied because Father did not sign the application. The passport agency required a notarized statement from Father affirming that he agreed to the renewal, which the Agency obtained from Father and sent to the passport agency on May 19, 2022.

At the June 15, 2022 hearing, Mother's counsel indicated that Father had called K.F. only twice since K.F. was placed with Mother. Father's counsel disagreed, asserting that Father made multiple attempts to contact

K.F., and that Mother did not answer or return Father's calls. The social worker confirmed that Father's calls had been scheduled for Thursdays at 6:00 p.m. The social worker also confirmed that Mother claimed she had made herself available but Father did not call, while Father claimed he did try to call but Mother did not answer. It was unclear to the social worker what was actually occurring. At Father's request, the court set the matter for a contested hearing regarding termination of jurisdiction, custody orders, and the reasonableness of services to Father.

In its addendum report, the Agency reported that Mother had not received any further information regarding the status of K.F.'s passport application. At the pre-trial conference on July 18, 2022, Father's counsel indicated that in the event the court terminated jurisdiction, Father would be asking for "a specific visitation order, the days and times for his virtual visitation, and visitation in person should he be [able] to travel here." Father's counsel stated she would speak to Mother's counsel about this prior to trial. In response to the court's inquiry regarding the progress of Father's virtual visitation with K.F., the Agency informed the court that since July 12, 2022, Father had called and Mother had answered three times, but K.F. did not want to speak with Father so they just spoke briefly.

At the outset of the contested hearing on August 1, 2022, there was a disagreement regarding whether the hearing was a section 364 family maintenance hearing or a section 366.21 review hearing. The court indicated that it was a section 366.21 contested review hearing, although K.F. had already been reunited with Mother and S.P. in the interim.

The social worker testified that neither she nor Mother had received any updates regarding K.F.'s passport. She also testified that during every monthly compliance visit with Mother, she would emphasize the importance

11

of Father's virtual visits with K.F., and that Mother would insist that Father was not calling. The social worker testified that in speaking with K.F. about the issue, K.F. would say "my dad doesn't call and it's fine, I don't want to talk with him." When asked whether she ever agreed to be the mediator to receive Father's calls, the social worker indicated that because of the time difference with Father living in the Philippines, the calls occurred at 6:00 p.m., making it "a little bit challenging for me or one of my other staff to do the calls." The social worker explained that she did not ask Father if he could call at a different time because that was an agreed-upon time between Mother and Father.

When asked whether there was a particular day or time that worked best for virtual visits, Father testified that Friday at 6:00 p.m. "California time" would work for him. Father testified that he last saw K.F. in person when she was three years old. He did not know what grade she would be entering that year, the name of her elementary school, the last time she went to the doctor, the name of her doctor, the last time she went to the dentist, or whether she was still going to therapy.

Mother's counsel proffered custody orders that allowed Father to enjoy unsupervised visits if he made himself available in San Diego as well as weekly virtual or telephonic visits at a mutually agreed time. Mother's counsel agreed to have the custody orders amended to reflect that the virtual visits would occur on Fridays at 6:00 p.m. Pacific Standard Time, as suggested by Father.

Father's counsel argued that Father did not receive reasonable services from the Agency because the Agency did not comply with the order granting Father an in-person visit and did not make reasonable efforts to ensure that Father received virtual visitation. Father asked the court to find that Father

12

did not receive reasonable services and to order additional services. In the event the court terminated jurisdiction, Father's counsel asked that the custody orders allow for the paternal grandparents to travel to the Philippines with K.F. on a yearly basis, and that there be an order for joint legal custody.

K.F.'s counsel argued that the Agency made reasonable efforts to provide Father with visitation. He relayed K.F.'s desire for the case to be closed and argued that the issues that brought the case to court had all been mitigated. K.F.'s counsel stated that he had no safety concerns with K.F. being in the home of Mother and S.P. and agreed with the terms of the proposed custody order.

The court found that the Agency made more than reasonable efforts to facilitate the in-person visitation between K.F. and Father. The court also found that the Agency made reasonable efforts to facilitate Father's virtual visitation with K.F. The court made its finding of reasonable services by clear and convincing evidence.

The court found that the protective issue that brought the matter before the court had been resolved and it placed K.F. with Mother and S.P. The court denied Father's request for joint legal custody, finding that it would not be in K.F.'s best interest. Likewise, the court found that it would not be in K.F.'s best interest to order K.F. to travel to the Philippines with paternal grandparents. The court indicated that visitation for Father would be granted as follows: "If [Father] makes himself available in person, he is able to enjoy unsupervised visitation in San Diego County. [¶] I'm also going to add in here that Father is to enjoy, at a minimum, one weekly telephonic virtual visit at a mutually agreed upon time as the Father has indicated he would like more telephonic contact with [K.F.] if possible." Father's counsel

13

did not ask for more specificity regarding Father's virtual or in-person visitation.

The court terminated jurisdiction over K.F. and issued a custody order granting legal and physical custody to Mother and S.P. The custody order included visitation for Father in line with the court's verbal order: "If [Father] makes himself available in person, he is able to enjoy unsupervised visitation in San Diego County. [Father] is to enjoy one at a minimum (1) weekly telephonic/virtual visit at a mutually agreed upon time."

## DISCUSSION

### A. *Substantial Evidence Supports the Juvenile Court's Finding that Father Received Reasonable Services*

Father argues that substantial evidence does not support the juvenile court's reasonable services finding by clear and convincing evidence. Specifically, Father argues that the Agency failed to provide reasonable reunification services because it did not do more to facilitate Father's in-person visit with K.F. and ensure Father's virtual visits with K.F. occurred. The Agency responds that the juvenile court was not required to make a reasonable services finding because K.F. had already been returned to Mother and S.P. According to the Agency, the June 15, 2022 hearing was converted from a section 366.21 family review hearing to a section 364 family maintenance hearing, which does not require an assessment of whether reasonable reunification services were provided. The Agency also argues that if a reasonable services finding was required, the applicable standard of proof under section 366.21, subdivision (e)(8) is a preponderance of the evidence,

14

not clear and convincing evidence.[4]  We need not resolve whether the juvenile court was required to make a finding of reasonable services, or what standard applies, because we conclude there is substantial evidence to support the court's finding by clear and convincing evidence.[5]

1.  Applicable Law

The purpose of reunification services is " 'to facilitate the return of a dependent child to parental custody.' "  (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1281.)  "The agency must make a good faith effort to develop and implement reasonable services responsive to the unique needs of each family.  [Citation.]  The effort must be made, in spite of difficulties in doing so or the prospects of success.  [Citations.]  The adequacy of the reunification plan and of the agency's efforts to provide suitable services is judged according to the circumstances of the particular case.  [Citations.]" (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 69 (*Christopher D.*).)

---

[4]  Effective January 1, 2023, the Legislature amended section 366.21, subdivision (e)(8) to provide that "[i]f the child is not returned to their parent or legal guardian, the court shall determine *by clear and convincing evidence* whether reasonable services . . . have been provided or offered to the parent or legal guardian."  (Italics added.)  The prior version did not include the italicized text.  (Compare Stats. 2017, ch. 829, § 7.5, with Stats. 2022, ch. 165, § 1.)

Both Father and the Agency argue that they should prevail under either standard.

[5]  The Agency also argues the reasonable services issue has been rendered moot by the termination of jurisdiction.  We disagree.  If we were to determine that the juvenile court's reasonable services finding was not supported by substantial evidence, we could grant effective relief by reversing the order terminating jurisdiction to permit additional services.

"A social services agency is required to make a good faith effort to address the parent's problems through services, to maintain *reasonable* contact with the parent during the course of the plan, and to make *reasonable* efforts to assist the parent in areas where compliance proves difficult. [Citation.]  However, in most cases more services might have been provided and the services provided are often imperfect.  [Citation.]  'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were *reasonable* under the circumstances.' " (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598–599 (*Katie V.*), italics added.)

"We determine whether substantial evidence supports the [juvenile] court's finding, reviewing the evidence in a light most favorable to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling." (*Katie V.*, *supra*, 130 Cal.App.4th at p. 598.) When applying the heightened clear and convincing evidence standard of proof, " ' "evidence must be so clear as to leave no substantial doubt.  It must be sufficiently strong to command the unhesitating assent of every reasonable mind." [Citation.]' [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971 (*Alvin R.*).)

2. Analysis

Father's substantial evidence argument focuses mostly on the Agency's alleged failure to make reasonable efforts to facilitate his visitation with K.F. He argues that despite the social worker's use of her own funds to pay for K.F.'s passport renewal (subject to reimbursement), the Agency failed to provide reasonable services in facilitating Father's in-person visit with K.F. because the Agency (through the social worker's supervisor) initially told the social worker that she could not use her own funds in February 2022, then

16

later approved the social worker's use of her own funds when the social worker asked again one month later in March 2022. Father contends that it is reasonable to believe the passport would have been renewed before the review hearing but for the one-month delay.

As an initial matter, we note that it is entirely speculative whether the passport would have been issued by August 2022 had the application been submitted in February or March 2022. The application was submitted on April 8, 2022, to be processed on an expedited basis in five to seven weeks. About four weeks later, on May 3, 2022, Mother received a notice from the passport agency requesting Father's notarized approval, which the Agency submitted on May 19, 2022. By the August 1, 2022 review hearing two-and-a-half months later, there were still no further updates regarding K.F.'s passport. Moreover, it is also speculative whether arrangements could have been made for K.F. to travel to the Philippines within that time frame had a passport been issued.

In any event, the Agency's one-month delay in allowing the social worker to use her own funds to pay for K.F.'s passport does not render the Agency's services to Father unreasonable. The social worker's request to use her own funds to pay for K.F.'s passport, and her follow-up request after all other options were explored and deemed unfeasible, exceeded the standard for reasonable services. Even if the Agency had continued to deny the social worker's request to use her own funds, we would not conclude that the Agency failed to provide reasonable services on that basis. The social worker certainly was not required to use her own funds, and the Agency did not have to allow her to do so in order to satisfy the standard for reasonable services. We cannot conclude that the Agency's delay in allowing the social worker to

go above and beyond the standard for reasonable services rendered the Agency's services unreasonable.

Father also argues that the Agency failed to provide reasonable services by failing to ensure his virtual visitation with K.F. occurred. Acknowledging the discrepancies between Mother's and Father's claims for why the visits were not occurring, Father argues that the social worker did nothing to address the issue beyond talking to Mother and Father and arranging a visitation schedule.

We conclude that there is substantial evidence that the Agency and the social worker made a reasonable effort to facilitate Father's virtual visits with K.F. During every monthly compliance meeting with Mother, the social worker did not simply accept Mother's explanation for why the visits were not occurring, but instead emphasized the importance of the visits. When the social worker asked Father to send screenshots showing the details of his purported calls to K.F., including the dates and duration of the calls, Father did not respond to the social worker's request. Moreover, K.F. made clear that she did not wish to speak to Father. We therefore conclude that the social worker made a good faith effort and acted reasonably in attempting to address Mother's and Father's claims for why the visits were not occurring. "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) However, "[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Ibid.*)

Father argues that the social worker's explanation for not serving as a mediator to receive and connect Father's calls to K.F. is analogous to

18

*Christopher D.*, where the Court of Appeal concluded that the social worker's efforts to provide the father with in-person visitation while he was in a residential substance abuse program were "totally inadequate". (*Christopher D.*, *supra*, 210 Cal.App.4th at p. 74.) We disagree that the circumstances here are similar. In *Christopher D.*, the social worker explained that "it was just very difficult" because of the social worker's case load and because of the drive from North County to San Diego. (*Id.* at pp. 73–74.) The court concluded "[t]he social worker's excuses of being *too busy* and Christopher's drug rehabilitation center being *too far* simply do not provide substantial evidence that the Agency exercised a good faith effort to provide the visitation services ordered by the court." (*Id.* at p. 74.)

Here, the social worker explained that "it's a little bit challenging for me or one of my other staff to do the calls" because the calls were scheduled for 6:00 p.m. due to the time difference with Father living in the Philippines. The social worker's inability to act as a mediator for Father's call was not due to inconvenience or a heavy case load as in *Christopher D.*, but rather because the call was scheduled at the end of business hours. Father does not contend that the social worker or someone from the Agency should have worked beyond normal business hours to serve as a mediator for the call. Instead, Father argues changing the scheduled call to 4:00 p.m. would have allowed the call to occur within normal business hours, which would allow for someone from the Agency to serve as a mediator. But Mother and Father had already agreed for the calls to take place at 6:00 p.m. and Father testified at trial that 6:00 p.m. worked best for him. Under these circumstances, the Agency's failure to arrange for a different time did not render its services unreasonable.

19

Finally, Father argues that the Agency failed to provide reasonable services in addressing K.F.'s reluctance to participate in virtual visits with Father. Father argues that the Agency should have implemented conjoint therapy to increase Father's chances of having more frequent contact with K.F., but failed to do so even though the court authorized conjoint therapy for Father and K.F.

Father cites *Alvin R.*, where the Court of Appeal stated that conjoint therapy "was surely critical" because the child "refused visitation for four months, and both the court and the social worker recognized that visitation would probably not take place without conjoint therapy." (*Alvin R.*, *supra*, 108 Cal.App.4th at p. 972.) In contrast, here, conjoint therapy was not determined to be necessary to facilitate visitation between Father and K.F. Instead, K.F.'s counsel suggested therapy for K.F. before the disposition hearing for the purpose of helping K.F. deal with the impact of potentially separating from her sisters if she were placed with Father—not to facilitate the relationship and further visitation between Father and K.F. K.F.'s counsel suggested that "perhaps [Father] can even participate" and the court questioned whether K.F. needed to be spending time with Father in a therapeutic setting. The court nonetheless authorized conjoint therapy but did not order it as a reunification service, and instead left it to the Agency as a case management decision.

Under these circumstances, the Agency's failure to implement conjoint therapy for K.F. and Father did not render its services unreasonable. In any event, Father did not raise the issue of conjoint therapy with the juvenile court, and we generally do not consider contentions raised for the first time on appeal. (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1528 [argument not raised below is forfeited on appeal]; *In re A.S.* (2018) 28

20

Cal.App.5th 131, 151 [failure to object in the juvenile court forfeits the issue on appeal].)

In determining whether services were reasonable, we must take into account all of the circumstances of the particular case. (*Christopher D.*, *supra*, 210 Cal.App.4th at p. 69.) Here, that includes the reality that Father was a non-custodial parent living in a different country; Mother had been the custodial parent for K.F.'s entire life; the juvenile court had already found that it would be detrimental to place K.F. with Father in the Philippines; we affirmed that finding in the prior appeal; and by the time of the August 1, 2022 review hearing, the issues that prompted the dependency proceeding had been resolved, K.F. had already been reunited with Mother for over six months, and she was doing well in her Mother's care. Under the circumstances presented, substantial evidence supports the juvenile court's finding that Father received reasonable services.

B. *The Custody and Visitation Orders Were Not an Abuse of Discretion*

Father argues that the juvenile court abused its discretion in denying Father's request for joint legal custody over K.F. and issuing an in-person visitation order that Father contends is too vague. We conclude that the custody and visitation orders were not an abuse of discretion under the circumstances.

1. Applicable Law

When the juvenile court terminates dependency jurisdiction, it may issue a custody and visitation order. (§ 362.4.) Under section 362.4, the court has broad discretion to fashion custody and visitation orders, considering the totality of the child's circumstances and the best interests of the child. (*In re Chantal S.* (1996) 13 Cal.4th 196, 206 (*Chantal S.*); *In re John W.* (1996) 41 Cal.App.4th 961, 973 (*John W.*).) A juvenile court custody and visitation

order, commonly referred to as an "exit order," is enforceable in family court. (*John W.*, at p. 970; *Chantal S.*, at p. 213.)

When making a custody determination, the juvenile court's focus and primary consideration is the best interests of the child. (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*).) The juvenile court is not bound by any family court preferences or presumptions, such as a presumption of parental fitness. (*Ibid.*, citing *Chantal S., supra,* 13 Cal.4th at p. 206.) "[A] finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons. [Citation.] By the same token, a finding that the parent from whom custody was removed no longer poses a risk of detriment or that the parent whose custody has been subject to supervision no longer requires supervision is relevant to, but not necessarily determinative of, the best interests of the child." (*Nicholas H.*, at p. 268.)

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32; *In re Maya L.* (2014) 232 Cal.App.4th 81, 102 ["We review a juvenile court's custody orders for abuse of discretion"].) We "may not disturb the order unless the court ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].' " ' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300; accord, *In re M.R.* (2017) 7 Cal.App.5th 886, 902.) We will find an abuse of discretion by a trial court only when we conclude that under all the circumstances, viewed most favorably in support of the decision,

22

no judge reasonably could have made that decision. (*Estate of Sapp* (2019) 36 Cal.App.5th 86, 104.)

  2. Analysis

  Father argues that because he did not present any safety concerns and has been a part of K.F.'s life, the juvenile court should have granted him joint legal custody of K.F. Citing *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 713 and *In re M.R.*, *supra*, 7 Cal.App.5th 886, Father argues that cases that have upheld exit orders denying joint legal custody to a parent "imply" that legal custody may not be denied absent some showing of risk associated with the parent. We disagree. While the existence of a safety issue may support denying joint legal custody to a parent, Father cites no authority for the proposition that a court *must* grant joint legal custody if there is no safety risk associated with the parent. To the contrary, a finding that a parent poses no danger to the child does not mean that parent is entitled to joint custody of the child, since joint custody may not be in the child's best interests for a variety of reasons. (See *Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268.)

  Here, by the August 2022 review hearing, K.F. was almost nine years old and Father had not seen her since she was three years old. Mother had been K.F.'s custodial parent in the United States for her whole life. Father lived in the Philippines, and he did not know information about K.F.'s schooling, medical care, dental care, or therapy. Whether due to geography or otherwise, Father was not an active participant in K.F.'s life, and K.F. had expressed a desire not to speak to him. In these circumstances, we conclude that it was not arbitrary, capricious, or patently absurd for the juvenile court to conclude that it was not in K.F.'s best interests for Father to "share the right and the responsibility to make the decisions relating to [her] health,

education, and welfare . . . ." (Fam. Code, § 3003 [defining "joint legal custody"].)

Father argues that he maintained contact with K.F., consistently requested custody of K.F., agreed to facilitate K.F.'s desire to maintain her relationship with her maternal family in California, and tried to travel to California to visit K.F. While we acknowledge and commend Father's desire to be a part of K.F.'s life, this does not make it an abuse of discretion for the juvenile court to determine that it would not be in K.F.'s best interest for Father to have joint legal custody over K.F.

Father also argues that the language of the juvenile court's in-person visitation order is too vague. Comparing this case to *In re T.H.* (2010) 190 Cal.App.4th 1119 (*In re T.H.*), Father contends that the in-person visitation order "essentially makes Father's visitation rights illusory by delegating to Mother virtually all authority to grant or deny visitation to Father." Again, we disagree.

In *In re T.H.*, the juvenile court ordered that father have supervised visitation " 'to be determined by the parents.' " (*In re T.H.*, *supra*, 190 Cal.App.4th at p. 1122.) The father's trial counsel objected to the failure of the order to establish a specific visitation schedule. Counsel requested mediation on the issue or a hearing " 'on what the proper exit order ought to be given the current situation.' " (*Ibid.*) The court declined to order mediation because the mother did not want to participate, and did not hold a hearing regarding the exit order. (*Ibid.*)

The Court of Appeal concluded that the order was "more than simply a delegation of the authority to set the 'time, place and manner' of the visitation—it effectively delegates to mother the power to determine whether visitation will occur at all." (*In re T.H.*, *supra*, 190 Cal.App.4th at p. 1123.)

24

The court noted that the mother had objected to the father having any visitation at all and reasoned that the mother, as the custodial parent, "could conceivably agree to only one visit a year or less without violating the letter of the court's order." (*Ibid*.) Thus, the juvenile court "abused its discretion by framing its order in a way that gave mother an effective veto power over [the father's visitation] right." (*Id*. at p. 1124.)

Here, as an initial matter, Father did not ask for a more specific in-person visitation order at trial. At the pre-trial conference, Father's counsel indicated that Father would be asking for a more specific visitation order and that he would communicate with Mother's counsel about that prior to trial. At trial, however, Father's counsel asked that the order allow paternal grandparents to bring K.F. to the Philippines to visit Father, but did not ask for any more specificity regarding Father's in-person visitation in San Diego. The juvenile court stated that the visitation for Father would be granted as follows: "If [Father] makes himself available in person, he is able to enjoy unsupervised visitation in San Diego County." Father's counsel did not object, and the written visitation order reflects the court's verbal expression of the order verbatim. Because Father did not object to the in-person visitation order as too vague, we need not consider this contention raised for the first time on appeal. (*In re Marriage of Davenport, supra*, 194 Cal.App.4th at p. 1528 [argument not raised below is forfeited on appeal]; *In re A.S., supra*, 28 Cal.App.5th at p. 151 [failure to object in the juvenile court forfeits the issue on appeal].)

Nonetheless, we conclude that the juvenile court did not abuse its discretion with respect to the in-person visitation order. Unlike in *In re T.H.*, Mother was not opposed to Father having in-person visits with K.F. To the contrary, Mother took steps to renew K.F.'s passport so that K.F. could visit

25

Father in the Philippines.  Moreover, the visitation order is not subject to Mother's agreement.  Instead, Father's in-person visits are contingent on Father's ability to make himself available in San Diego County, which makes sense given the court's determination (which Father does not dispute on appeal) that K.F. should not be forced to travel to the Philippines.  If Father does make himself available, the order does not delegate to Mother any ability to veto Father's visits.  Because of the uncertainty as to when or for how long Father might be able to visit San Diego County, or what else might be going on in K.F.'s life when he visits, it was reasonable for the juvenile court not to set any specific schedule for the unsupervised visitation at this time.  Thus, we conclude that the juvenile court did not abuse its discretion under the circumstances.

DISPOSITION

The judgment is affirmed.


BUCHANAN, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.